UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| IN RE: EAST SYSTEMS, INC.<br>DEBTOR | CASE NO. 03-10855-DWH<br>CHAPTER 11 |
| RICHARD MANDRELLA | PLAINTIFF |
| VERSUS | ADV. PROC. NO. 06-01138-DWH |
| GEORGE EAST, JUDY H. EAST,<br>EAST SYSTEMS, INC., and<br>AUTOMATED TECHNOLOGIES, INC. | DEFENDANTS |

OPINION

On consideration before the court is a complaint filed by the plaintiff, Richard Mandrella, ("Mr. Mandrella"), against the defendants, George East, ("Mr. East"); Judy H. East, ("Mrs. East"); East Systems, Inc., ("ESI"); and Automated Technologies, Inc., ("AMT"); an answer and affirmative defenses having been filed by the said defendants; on proof in open court; and the court, having heard and considered same, hereby finds as follows, to-wit:

I.

Jurisdiction

The court has jurisdiction of the subject matter of and the parties to this proceeding pursuant to 28 U.S.C. §1334, as well as, the General Order of Reference which was entered by the United States District Court for the Northern District of Mississippi on July 27, 1984.

Mr. Mandrella filed his complaint directly, as well as, derivatively on behalf of AMT against Mr. East, Mrs. East, AMT, and the above captioned Chapter 11 debtor, ESI. The

complaint essentially alleges that Mr. and Mrs. East breached their corporate fiduciary duties to AMT and diverted certain corporate opportunities of AMT for the benefit of ESI. As such, certain parts of this cause of action would be considered a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (B), and (O). Other parts of the cause of action would be considered a non-core proceeding, specifically Mr. Mandrella's claims against the non-debtor individuals, Mr. East and Mrs. East. Regardless, the parties, pursuant to 28 U.S.C. § 157(c)(2), expressly consented that this court could determine all issues involved in this proceeding and enter an appropriate final order or judgment. *See Stern v. Marshall*, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), and *Technical Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399 (5th Cir. 2012). Should this matter be appealed and the appellate court determine that this court, even in view of the parties' express consent, did not have constitutional authority to enter a final order, then this court would recommend that this opinion be considered by the appellate court as proposed findings of fact and proposed conclusions of law.

II.

Pre-trial Order Stipulations

In the pre-trial order, entered in this proceeding on July 14, 2012, the parties stipulated to the following:

    a.    George East is/was the President and a director of AMT and is/was the owner of 50% of the stock of AMT.

    b.    Judy H. East is/was the Secretary/Treasurer and a director of AMT.

    c.    Richard Mandrella is/was the Vice President and director of AMT and is/was the owner of 50% of the stock of AMT.

    d.    AMT was incorporated on May 16, 1996.

e.  AMT initially operated out of the Easts' house at 440 Timber Creek Dr, Columbus, MS, with the telephone number of 601/244-7070.

f.  Numerous discussions occurred by, between and among the Easts and Richard Mandrella at the Easts' home. A number of these discussions in early 1997 concerned corporate salaries, divisions of labor, divisions of profits and efforts to maintain the core business of AMT.

g.  The bylaws of AMT provide:

> 1. Directors of AMT will not serve on the board of directors of AMT while engaged in or interested in a competing business, either individually or as an employee or stockholder thereof; and
>
> 2. Directors of AMT will conduct the duties of a director of AMT in good faith with the care an ordinarily prudent person in a like position would exercise under the circumstances in light of the knowledge possessed by the director concerning the matter in question and in a manner the director reasonably believes to be in the best interest of AMT.

h.  George East is/was the President, Secretary and a director of ESI.

i.  Judy H. East is/was the Vice President, Treasurer and a director of ESI.

j.  George East and Judy H. East are/were the owners of 50% each of the stock of ESI.

k.  ESI was originally incorporated as East Engineering, Inc. on April 7, 1997.

l.  ESI initially operated out of th Easts' house at 440 Timber Creek Dr, Columbus, MS, with the telephone number of 601/244-7070.

m.  George and Judy East caused the equipment, telephone number, records, customer lists and customer projects of AMT to be moved over the ESI in 1997.

n.  Judy H. East quit filing annual reports and payroll tax reports and income tax returns for AMT after 1999 due to lack of business being conducted by AMT.

o.  In 2000, the Easts caused ESI to build a building for the corporation's business operations at 41 Fabritek Drive, Columbus, MS, with the phone number of 601/244-7070.

p.  AMT was administratively dissolved March 9, 2001.

q.  On or about October 31, 2002, ESI borrowed $350,283 from BancorpSouth.

r.  On or about November 11, 2002 ESI paid $75,000 to Maxine Hollingsworth, $147,435.21 to Judy Hollingsworth East and $63,214.10 to John David East, a minor of tender years.

s.  ESI filed for bankruptcy on February 12, 2003.

III.

Factual Background

Through their respective places of employment, Mr. Mandrella and Mr. East became acquainted. Mandrella was employed by Kraftronics and East was employed by GenCorp. After several discussions, the two determined that they would form a separate corporation for the purpose of beginning their own business. Mrs. East contacted a local attorney, Joseph Studdard, who prepared the necessary papers to incorporate AMT on May 16, 1996. Mrs. East and Studdard were listed as the incorporators, and Mr. East, Mr. Mandrella, and Mrs. East were listed as the officers and directors. Mr. East was the president, Mr. Mandrella was the vice president, and Mrs. East was the secretary-treasurer. Mr. East and Mr. Mandrella were each issued 100 shares of the corporate stock, which meant that each was a 50% owner of the corporation.

The contemplated roles that these three individuals were to play in the corporate structure were important to the perceived development of the business activities, as well as, the successful functioning of operations. Mr. East was to be responsible for the engineering and technological

development of the corporation's products. Mrs. East was to be responsible for the bookkeeping, financial, and accounting functions. Mr. Mandrella was to be responsible for the solicitation of vendors to sell materials to the corporation, as well as, for the development of the corporation's customer base.

The initial plans called for Mr. Mandrella to terminate his employment with Kraftronics shortly after the incorporation of AMT. Because certain benefits would vest for Mr. East if he continued working at GenCorp for several more months, he was not to terminate his employment with GenCorp until early 1997. However, Mr. East was to work, and did work, during the balance of 1996 both in his spare time and on weekends on business activities for AMT. In keeping with his original commitment, Mr. East terminated his employment with GenCorp at the end of calendar year 1996. Although he had already devoted substantial time on AMT's activities, beginning in 1997, he was engaged full time on behalf of AMT.

Insofar as Mr. Mandrella was concerned, his role in the plans for AMT's development, mentioned hereinabove, never materialized. The solicitation of vendors to supply materials to AMT, the establishment of lines of credit, and all other financial arrangements were undertaken primarily by Mrs. East with the assistance of Mr. East. The product development and the solicitation of customers for AMT was undertaken by Mr. East. Mr. Mandrella, who did not terminate his employment with Kraftronics until early 1997, provided no discernable services for AMT. The substantial number of spare time hours and weekends that Mr. East devoted to AMT, coupled with his continued employment at GenCorp, placed a noticeable strain on him personally, as well as, on his marriage.

Toward the end of 1996 and into early 1997, Mr. and Mrs. East became extremely dissatisfied with Mr. Mandrella's lack of effort insofar as AMT was concerned. Numerous discussions occurred by and between the Easts and Mandrella at the Easts' home. A number of these discussions concerned the setting of corporate salaries, the divisions of labor, the divisions of profits, and efforts to maintain the core business of AMT. According to the testimony of both Mr. and Mrs. East, Mr. Mandrella never agreed to anything that they proposed.

At the outset, Mr. Mandrella represented to the Easts that he could generate significant income for AMT through the sales of parts and "loose pieces." This income never materialized because Mr. Mandrella made no effort to perform. Mr. East, on the other hand, successfully negotiated a Systems House Contract with Eurotherm Drives, Incorporated, on September 12, 1996, which permitted AMT to operate as a distributorship with pricing advantages. With the assistance of Richard Lynch, a sales representative who located projects for companies such as AMT and who had been introduced to Mr. East by Mr. Mandrella, Mr. East was able to obtain two projects for AMT with International Wire. Coincidentally, the first of these projects had initially been offered by International Wire to Kraftronics where Mr. Mandrella was employed, but a contract could not be negotiated because the Kraftronics terms were not workable. These first two projects were successfully completed by AMT, so discussions commenced concerning a larger International Wire project in the Phillippines. However, before any contact could be finalized for this third project, the relationship between the Easts and Mr. Mandrella further unraveled.

On February 17, 1997, AMT had its annual meeting, and subsequently, on March 3, 1997, a meeting of the AMT Board of Directors occurred. While there was much ado made about these

meetings at trial, the substantive effect of these meetings was negligible. Mr. and Mrs. East offered to acquire Mr. Mandrella's stock in AMT by the return of his initial $2,000.00 investment. Mr. Mandrella advised that he did not agree to this proposal, and he voided the $2,000.00 check that had been issued to him. In response to the Easts' proposal, Mr. Mandrella sent a letter to Mr. East, dated March 14, 1997, which contained the following pertinent provisions:

> I reviewed the contract you proposed with my attorney. After he and I reviewed the terms, it was decided that it is not possible for me to sign or agree to the terms as they are proposed. This decision centers on several issues. I was not a commissioned sales person with you before I terminated my employment with my former employer. I joined you as a 50% stockholder of Automated Machine Technologies, with the understanding I could not work for AMT in any sales capacity until I terminated that employment. I could only help with the set-up of vendors and work in an advisory capacity with regard to contracts, etc. These terms were agreed to by both of us. If I signed a document to this effect, I could be open to a law suit by my former employer because of a conflict of interest, and it would cast suspicion on my integrity.
>
> The other key factor is that under this contract, as sincere as you may want to be, you cannot guarantee me access to the vendors in the future. These vendors are contracted to Automated Machine Technologies. They might not want a distributor in another location as different corporations market in different manners.
>
> The check that Judy insisted I take with me in case I decided to relinquish my stock has been voided and enclosed with this letter.
>
> . . . .
> The first step would be for you and me to each start another corporation. Your corporation would be called Automated Machine Technologies of Mississippi. This would be 100% owned by you.
>
> I will form a corporation called Automated Machine Technologies of Alabama. This corporation would be 100% owned by me.
>
> We will meet in the very near future to finalize an agreement on the relationship between our individual corporations. This is primarily the division between

7

systems and parts distribution that we each feel would allow us to control our own destiny. We must get very detailed so there will be no misunderstandings in our relationships. The funds presently held by AMT would be dispersed between AMT Alabama and AMT Mississippi on the basis of our reaching a final agreement on these matters.

AMT would be a holding corporation for our vendors. AMT Alabama and AMT Mississippi would each receive blank purchase orders from AMT. AMT Alabama will process its own purchase orders and pay the vendors with its own checks. As long as the checks clear, our vendors will not care it there is a slight difference in the name of the corporation paying the invoice. AMT Alabama will stock and have product sent to Alabama. AMT Alabama will invoice its own customers. AMT Mississippi will do its own accounting and invoicing. When AMT Alabama pays an invoice a copy of the canceled check and the invoice will be sent to Columbus to be posted. AMT Mississippi would follow the same procedure. By this procedure no extra set of books would have to be carried. Each individual company could contribute about $1000.00 per year for the posting time and accounting costs relevant to AMT. This is a simple procedure and could be done by either side. The money would also cover any corporate incidental expenses needed by AMT.

To make sure each individual corporation pays its obligations to AMT, a stock pledge contract would be set up. This is a credit agreement that AMT will extend to the Alabama and Mississippi corporations. The bank would hold all of our stock and it either side violated the terms of credit by not paying its bills, the debtor individual would forfeit his stock to the opposite party. In this way if either of us sold our corporation to another party, the new owner would be accountable to the terms of the stock pledge.

Commission payments for drive systems and parts would be direct payments between AMT Alabama and AMT Mississippi.

The advantages to this system are obvious. It allows us the independence to operate our individual corporations within the structure of our business contract. It also isolates each of us from liabilities incurred by the other. It also allows each corporation a degree of support for each other, as we are aiming for the same goals.

See Exhibits P-79 and D-24.

In the opening paragraph of his letter, Mr. Mandrella admitted that he had reneged on his initial commitments to the Easts and AMT, both in negotiating sales and in locating vendors.

8

On April 10, 1997, Mr. Mandrella wrote a second letter to Mr. East which evidences that the relationship between the two had completely deteriorated. See Exhibit P-81. Since Mr. Mandrella and Mr. East owned 50% of AMT, a stalemate existed which meant that the corporation and its activities were effectively deadlocked.

On April 7, 1997, because of the stalemate, Mr. and Mrs. East incorporated East Engineering Inc., which subsequently became East Systems, Inc., ("ESI"). Mr. and Mrs. East were the officers, directors, and sole owners of ESI.

Although AMT had submitted a bid for the International Wire project in the Phillippines on March 11, 1997, Mr. East on behalf of East Engineering Inc., submitted a competing bid on April 11, 1997. See Exhibit P-57. According to the deposition testimony of Billy Bob Jones, the International Wire representative, the contract for this project was not awarded based on either of these bids. ESI resubmitted a bid as an authorized Eurotherm Drives Systems House and Distributor, on August 5, 1997, and was awarded the contract for the project. See Exhibit P-58. Mr. East had apparently successfully negotiated a contractual relationship with Eurotherm Drives, Incorporated, on behalf of ESI in June, 1997. To the understanding of the court, this allowed a favorable pricing advantage for ESI which could be passed through to International Wire.

Beginning on March 28, 1997, and continuing through September 19, 1997, AMT disbursed salary checks to Mr. East totaling $135,555.00, which was at the rate of $105.00 per hour. See Exhibit P-83. According to the testimony of Mrs. East, Mr. East had worked for AMT a total of 1,472 hours, but was paid for only 1,291 of those hours. This meant that he was not paid for working a total of 181 hours. The total hours worked by Mr. East and the hours for

which he was paid no compensation were not disputed. Ironically, Mr. Mandrella complained that the hourly rate was too high because it would not allow AMT to generate a profit.

Mrs. East was paid during this same time frame the total sum of $26,400.00 by AMT for the services that she rendered. See Exhibit P-82 (Exhibit 38). Therefore, the total compensation that was paid to both Mr. and Mrs. East during 1997 was $161,955.00.

Mr. Mandrella never agreed to the amounts of these salaries. He also never drew a salary from AMT, but the trial testimony reveals that he never did anything to earn a salary.

As set forth in the pre-trial order stipulations, Mr. and Mrs. East caused the equipment, telephone number, customer list, and the projects of AMT to be moved to ESI in 1997. Mrs. East stopped filing annual reports, payroll tax reports, and income tax returns for AMT after 1999 due to the lack of business being conducted by AMT. AMT was thereafter administratively dissolved by the Mississippi Secretary of State on March 9, 2001.

Relying on the report prepared by Richard Russ, Tann, Brown & Russ Co., PLLC, Certified Public Accountants, Mr. Mandrella asserts that the lost revenue to AMT as a result of the actions of Mr. East, Mrs. East, and ESI ranged from $461,498.00 to $644,329.00, which includes an upward adjustment to take into account the compensation paid to Mr. and Mrs. East. Consequently, Mr. Mandrella asserts that he would have benefitted from 50% of the lost business revenue which would indicate that his damages would range from $230,749.00 to $322,164.50. Mr. Mandrella's damages calculation, however, is extracted exclusively from numbers appearing on the income tax returns for the two Subchapter S Corporations. When compared to the actual profit and loss statements for the corporations, the results are dramatically different. The following calculations are extracted from Exhibit P-82 (Exhibits 1 - 9):

Exhibit 1: AMT   May 16, 1996 through December 31, 1996

| P & L Statement Net Loss | Income Tax Return Net Loss |
| --- | --- |
| ($45,031.09) | ($631.00) |

Exhibit 2: AMT   January 1, 1997 through December 31, 1997

| P & L Statement Net Loss | Income Tax Return Net Profit |
| --- | --- |
| ($143,894.54) | $1,881.00 |

Exhibit 3: ESI   January 1, 1997 through December 31, 1997

| P & L Statement Net Profit | Income Tax Return Net Profit |
| --- | --- |
| $2,891.71 | $85,365.00 |

Exhibit 4: ESI   January 1, 1998 through December 31, 1998

| P & L Statement Net Loss | Income Tax Return Net Profit |
| --- | --- |
| ($94,576.67) | $206,758.00 |

Exhibit 5: ESI   January 1, 1999 through December 31, 1999

| P & L Statement Net Loss | Income Tax Return Net Profit |
| --- | --- |
| ($164,870.71) | $105,629.00 |

Exhibit 6: ESI   January 1, 2000 through December 31, 2000

| P & L Statement Net Loss | Income Tax Return Net Profit |
| --- | --- |
| ($140,204.85) | $101,359.00 |

Exhibit 7: ESI   January 1, 2001 through December 31, 2001

| P & L Statement Net Loss | Income Tax Return Net Profit |
| --- | --- |
| ($53,299.74) | $121,975.00 |

Exhibit 8: ESI   January 1, 2002 through December 31, 2002

| P & L Statement Net Loss | Income Tax Return Net Loss |
| --- | --- |
| ($258,233.40) | ($128,429.00) |

Exhibit 9: ESI   January 1, 2003 through December 31, 2003

P & L Statement Net Loss             Income Tax Return Net Profit
($149,229.65)                        $100,017.00

As can be seen from the above exhibits that were attached to Exhibit P-82, there is a wide disparity between the figures set forth on the profit and loss statements, which primarily reflect net losses, compared to the numbers utilized to calculate Mr. Mandrella's damages which are primarily net profits from the corporate tax returns.

Mr. Mandrella initially filed this cause of action against the Easts, ESI, and AMT in the Chancery Court of Lowndes County, Mississippi, in May, 1997. ESI filed its voluntary petition for relief pursuant to Chapter 11 of the United States Bankruptcy Code in this court on February 12, 2003. Thereafter, the Chancery Court lawsuit was removed to the United States District Court for the Northern District of Mississippi and then transferred to this court for disposition.

Mrs. East testified that presently ESI is substantially in debt. More specifically, she related that ESI has accounts payable in the sum of $667,000.00, and trade debts totaling $239,000.00. She compared these liability numbers to the ESI cash on hand in the sum of $7,500.00, and accounts receivable totaling $83,000.00. Mrs. East testified that an adverse judgment against the individual defendants would likely push both of them into a personal bankruptcy case. This testimony, coupled with what is reflected on the profit and loss statements, confirms that neither AMT or ESI were as profitable as suggested by Mr. Mandrella.

IV.

Conclusions

The court has reviewed the statutory provisions found in Miss. Code Ann. § 79-4-8.60, *et seq.*, subtitled "Director's Conflicts of Interest." These sections and their predecessors have been construed by the Mississippi Supreme Court on numerous occasions. Mr. Mandrella filed his complaint against the defendants directly and derivatively as a shareholder of AMT for the benefit of AMT. In support of his claim that the Easts usurped corporate opportunities from AMT, Mr. Mandrella cited *Ellzey v. Fyr-Pruf, Inc.*, 376 So. 2d 1328 (Miss. 1979), which involved a derivative action brought by shareholders against the officers and directors of Fyr-Pruf, Inc., alleging that they had usurped business opportunities belonging to Fyr-Pruf, Inc. This court concurs with the following comments offered by the Mississippi Supreme Court, to-wit:

> Where usurpation of a corporate opportunity as opposed to self-dealing is alleged in the bill, a more complex showing will be required to sustain the complaint's initial burden of proof. First, it must be shown by a preponderance of the evidence that under all the facts and circumstances the business opportunity is logically related to the corporation's existing or prospective activities. Second, the complainant must prove that the corporation was either (a) not insolvent in the balance sheet sense at the relevant times, or (b) financially disabled as a result of a nonpayment of a debt or breach of a fiduciary duty by one or more of the defendants. This second element of the complainant's case has been met, in our opinion, by the appellants.
>
> Once the complainant satisfies these two elements by proof, the business opportunity may be regarded as a corporate one and the burden of proof shifts to the fiduciary to absolve himself of liability in accordance with the principle stated in *Knox.* [*Knox Glass Bottle Co. v. Underwood*, 228 Miss. 699, 89 So. 2d 799 (Miss. 1956)]. Good faith alone, even in the absence of harm to the corporation, will not suffice to absolve the fiduciaries of liability: it must be clear that the duty of fidelity and diligence, as well as the duty of continuing disclosure of material facts, has been fully discharged. See gen. Knepper, Liability of Corporate Officers and Directors, § 3.04, n. 36 and accompanying text (3rd Ed. 1978). Finally, if the corporation was a going concern when the business opportunity was presented to the fiduciaries, they

must also show that they did not compete to the economic detriment of the corporation.

*Id.* at 1335-36.

Mr. Mandrella also cited *Hill v. Southeastern Floor Covering Co., Inc.*, 596 So. 2d 874 (Miss. 1992), a case which addressed the breach of the fiduciary duty owed by a general manager of a corporation to the corporation. The Court initially discussed the concept of corporate opportunity, as follows:

> Hill owed to Southeastern the duty to exercise the utmost good faith and loyalty. *Fought v. Morris*, 543 So.2d at 171; *Gibson v. Manuel*, 534 So. 2d 199, 201 (Miss.1988). One of the ways that the duty of good faith and loyalty may be breached is through the doctrine of corporate opportunity. This doctrine is defined as follows:
>> [t]he doctrine of corporate opportunity prohibits directors or officers from appropriating to themselves business opportunities which in fairness should belong to the corporation. If there is presented to a corporate director or officer a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and if embracing the opportunity will bring the self-interest of the director or officer into conflict with that of the corporation, the director or officer may not seize the opportunity for himself.

*Id.* at 877.

The court then pointed out that the corporation must be able to take advantage of the opportunity. This factor is extremely pertinent to the proceeding currently before this court because AMT could not do so.

> A complaining party must show by a preponderance of the evidence that under all the facts and circumstances the business opportunity was logically related to the corporation's existing or prospective activities. <u>It must also establish that (1) the corporation was able to take advantage of the opportunity by showing that the corporation was not insolvent at the relevant times,</u> or (2) financially disabled as a

14

> result of nonpayment of debts or breach of a fiduciary duty. This establishes a prima facie case of business opportunity and shifts the burden to the fiduciary to rebut the prima facie case. *Ellzey v. Fyr-Pruf, Inc.*, 376 So. 2d 1328, 1335 (Miss.1979).

*Id.* at 877- 78 (emphasis supplied).

The evidence presented at trial convinces the court that in late 1996 and early 1997, Mr. and Mrs. East had completely lost faith and trust in Mr. Mandrella. As will be discussed in more detail hereinbelow, it was obvious that Mr. Mandrella had not fulfilled the commitments that he had made to the Easts or to AMT, and he had contributed practically nothing to the AMT business operations. The meetings between these parties which occurred in early 1997, as mentioned hereinabove, were completely unproductive and failed to establish a viable plan for AMT to move forward. Mr. and Mrs. East, with good reason, were unwilling to continue performing all of the work for AMT, and Mr. Mandrella was unwilling to negotiate an alternative strategy. According to the testimony, Mr. Mandrella would never agree to anything, apparently relying on his 50% ownership as a "trump card." In the opinion of the court, the deadlock that existed between the two shareholders created a corporate stalemate. AMT, therefore, was completely dysfunctional and had no ability whatsoever to continue its business activities without Mr. East and Mrs. East volunteering their services.

To his credit, even in the absence of an agreement with Mr. Mandrella, Mr. East did see that AMT completed its existing contracts, and he performed warranty work that was required of AMT during the remainder of 1997. Consistent with his previous track record, Mr. Mandrella contributed nothing to this effort.

The court recognizes that it would have been preferable at this time for these parties to have dissolved AMT, but they could not do so because that would have required at least a majority vote of the shareholders as set forth in Miss. Code Ann. § 79-4-14.02(e). The other avenue to dissolve AMT was a judicial dissolution in chancery court through a proceeding initiated by a shareholder as set forth in Miss. Code Ann. § 79-4-14.30(a)(2). However, neither Mr. East nor Mr. Mandrella filed such a proceeding. The incentive to file a dissolution proceeding was likely deterred when Mr. Mandrella commenced this cause of action in the Chancery Court of Lowndes County in May, 1997.

In the opinion of the court, Mr. Mandrella needs to take a look in the mirror. He has accused Mr. and Mrs. East of disloyalty, fraud, and breach of their fiduciary duties to AMT. During this same time frame, Mr. Mandrella breached his fiduciary duties to AMT through his unfilled commitments and broken promises, to-wit:

1) Mr. Mandrella failed to produce the significant income that he had promised through the sales of parts and "loose pieces." In his letter, dated March 14, 1997, he acknowledged that he did not pursue these sales because of a perceived conflict of interest that he might have with his employer, Kraftronics.

2) Mr. Mandrella failed to recruit or establish financing arrangements with vendors for AMT. This was undertaken by both Mr. and Mrs. East, and, on at least one occasion, a line of credit was personally guaranteed by Mr. East.

3) Mr. Mandrella did not recruit customers for AMT. Apparently, he perceived this to be yet another conflict of interest with his employment with Kraftronics.

4) Although Mr. Mandrella had committed to terminate his employment with Kraftronics shortly after AMT was incorporated in May, 1996, he did not do so until January, 1997. This obviously created substantial problems for Mr. and Mrs. East, as well as, AMT since they had relied on his availability and participation. As noted hereinabove, Mr. East terminated his employment with GenCorp just as he said he would.

> 5) According to the undisputed testimony, Mr. Mandrella would never agree to such fundamental concepts as the payment of salaries, the division of labor, or the division of profits.

This court agrees completely with the decisions of the Mississippi Supreme Court, cited hereinabove, and will apply those principals to this decision. However, there are significant factors that must be considered in reaching a just result, to-wit:

> 1) By early 1997, AMT, had become a dysfunctional corporate entity. Metaphorically stated, it was "dead in the water," and, absent the efforts of Mr. and Mrs. East, could do no meaningful business activities. Mr. and Mrs. East were not legally required to place AMT on their shoulders and perform all of its operations without a workable organizational structure or a definitive plan for compensation. In effect, AMT was incapable of performance because of the stalemate. It literally could not take advantage of the opportunities that Mr. Mandrella asserts were usurped or diverted.
>
> 2) As set forth in detail hereinabove, Mr. Mandrella has failed to recognize that he breached his fiduciary duties to AMT. Indeed, his actions, or more appropriately, his inactions, led to AMT's dysfunctional status. This court would have difficulty awarding damages to Mr. Mandrella, as compensation for earnings purportedly generated by AMT and ESI, when it is obvious that he contributed nothing to the production of this income.
>
> 3) The range of damages claimed by Mr. Mandrella as a result of his 50% ownership interest in AMT, that is, from $237,749.00 to $322,164.50, is "illusory" because it is calculated from the Subchapter S corporate tax returns for AMT and ESI which reflect substantially higher earnings than the actual profit and loss statements for the identical years, which for the most part reflect net losses.
>
> 4) Although this issue was not addressed at trial, the court would point out that had Mr. East initiated a judicial dissolution of AMT pursuant to Miss. Code Ann. § 79-4-14.30(a)(2), prior to incorporating East Engineering, Inc., and East Systems, Inc., most of the issues in this cause of action would have been put to rest many years ago. However, this did not occur. Mr. Mandrella did not file a judicial dissolution proceeding either; he just sued for undeserved damages for himself.

For the reasons cited hereinabove, the court is of the opinion that the complaint filed by Richard Mandrella against the defendants, George East; Judy H. East; East Systems, Inc.; and Automated Machine Technologies, Inc., is not well taken. A judgment dismissing the complaint in its entirety with prejudice and denying all the relief requested therein, including the request for an award of attorney fees, will be entered contemporaneously with this opinion.

This the 28th day of December, 2012.

DAVID W. HOUSTON, III
UNITED STATES BANKRUPTCY JUDGE